[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action was commenced by the plaintiff on February 10, 1997, in the Judicial District of Ansonia/Milford, seeking a finding of paternity pursuant to Conn. Gen. Stat. § 46b-162
for a minor child, Blake Joseph Black, born March 27, 1996. The case came before this court for special hearing and trial on June 2, 1999.
The parties are mature adults who began seeing each other briefly during 1990. However, the parties began to date each other again in 1995. Plaintiff and defendant had sexual relations on several occasions in 1995, wherein plaintiff claims the first time in 1995 was the night of July 10. Plaintiff denies ever having sexual relations with anyone other than defendant during that year of 1995. Defendant does not deny having sexual relations with plaintiff commencing August 10, 1995, however, he infers that there may have been another party with whom she had sexual relations during that year.
DNA tests were taken in 1996 by Lab Corp and in 1998 by CT Page 4 Identigene. Both tests did not exclude defendant as father, but both concluded probabilities of paternity above 99%. The second test was performed upon defendant's request.
The defendant claims:
1. He was not intimate with plaintiff at the time of July 10, 1995.
2. That this court should take judicial notice that thirty nine (39) weeks is the gestation period for human childbirth. This would indicate that plaintiff conceived on June 28, 1995, at which time she admits she did not have relations with defendant. And the conception date of June 28 would also rule out that plaintiff conceived on August 10, 1995 at which time defendant admits having sexual relations with plaintiff.
3. Plaintiff had the Human Papilloma virus (HPV) and that such a virus altered the DNA which led to unreliable DNA test results.
DISCUSSION
The fact that the parties were engaged in sexual relations in the summer of 1995 is uncontroverted, the question being the dates of such sexual relations. The petitioner testified that to the best of her recollection she was fairly certain about having intercourse with the defendant on the evening of July 10, 1995 at his home in Morris, Connecticut. She further recalled she had brunch with defendant on July 9, 1995 and arrived at his house in midafternoon on that date. She claims she stayed in Morris, Connecticut until the early hours of July 11, 1995 at which time she returned to her own home. She testified she was at the Morris house all day on July 10, 1995 and said "we may have left to go to the grocery store, I don't recall."[1] However, she testified that she stayed at the Morris house that night of July 10, 1995 and had sexual intercourse with the defendant. Defendant, aside from denying they were at his Morris house on July 10, 1995, documented that an that date that he was performing sundry tasks away from Morris for about 3 hours in the early afternoon on that date. He did not have any documentary evidence as to his whereabouts on the evening of July 10, 1995. During the time that plaintiff claims that he was having brunch with defendant on July 9, 1995, defendant claims that he was taking care of other matters such as delivering part of a boat to his son. However, nothing was documented on July 9, 1995 other than a gasoline receipt which was not addressed to him and could CT Page 5 have belonged to anyone. His son was never called as a witness to support his alibi on his whereabouts on July 9, 1995.
Defendant testified on cross examination that he called the plaintiff quite often during the period of their courtship. In fact, he produced a copy of his phone bill on calls from Morris, Connecticut during the period of July showing he called plaintiff eleven (11) times from July 1 to July 8, 1995 (some calls twice a day — see defendant's exhibit #5), but no calls were made to plaintiff on July 9, 1995 when defendant said he was home in Morris, Connecticut, nor was there any evidence he called plaintiff from any other location on July 10, 1995. Defendant testified from notes he used to refresh his recollection. These notes were prepared specifically for the purpose of testifying 8 months prior to trial.[2]
The trier of the case is the judge of the credibility of these witnesses and the weight to be given to their testimony, Griffinv. Nationwide Moving and Storage Co., 187 Conn. 405, 422 (1982); and the trier of the fact has the right to accept part and disregard part of the testimony of the witness, Barrilla v.Blake, 190 Conn. 631, 638 (1983). Defendant claims that by the evidence he presented, he has raised a "doubt" as to his presence in Morris, Connecticut on July 10, 1995. Plaintiff must only prove her case by a fair preponderance of the evidence in a paternity proceeding. Palomba v. Grey, 208 Conn. 21, 25 (1988). "Fair preponderance of the evidence" is defined as "the better evidence, the evidence having the greater weight, the more convincing force in your mind." Cross v. Huttenlocber,185 Conn. 390, 394 (1981). I find the testimony of the plaintiff with regard to the facts in dispute to be credible and that she was with the defendant on July 10, 1995 and had sexual relations with him that evening at his house in Morris, Connecticut.
Defendant has raised the issue that even if she became pregnant, by any partner, it could not have been on July 10, 1995 because of the gestation period calculation, which defendant requests the court to take judicial notice. The Connecticut Code of Evidence, section 201 states the court may take judicial notice. (emphasis added) Connecticut and foreign courts in paternity cases have granted such requests in the past. This court agrees to take such judicial notice, however, what calculation should the court take notice of? The defendant requests the court take notice that 39 weeks is the gestation period and that you count back 39 weeks from the birth of the child to determine the date CT Page 6 of conception. The case cited by defendant for authority to take Judicial Notice, Melanson v. Rogers, 38 Conn. Sup. 484, 490-491
(1982) used 9 months as the normal gestation period. Gelinas v.Nelson, 165 Conn. 33, 38 (1973) used 38 weeks ± 12.88 day as the normal gestation period (see Williams obstetrics (13 Ed. pgs. 218-220)). An Ohio court used approximately 280 days as the period stating, "this period may vary somewhat depending upon the condition of the mother. It is not necessary to prove the exact date on which the complainant became pregnant, but the act of intercourse must be shown to have occurred on such a date as will satisfy you that the child was the result of such intercourse."Crawford v. Hasberry, 186 N.E.2d 522 (1962).
Actually, in this case, plaintiff delivered the child 38 weeks after July 10, 1995. This would bring it squarely on the figure given in the Gelinas case without the plus or minus figure. It was just short, or minus, one week (seven days) from the 39 week request but within the 12.88 day minus figure of Gelinas.
Similarly allowing the 12.88 day leeway, it falls within the nine months of Melanson case. The court is satisfied that the child born on March 27, 1996 could be the result of the intercourse between the parties on July 10, 1995.
There were two separate DNA tests relating to paternity. One was performed by Lab Corp in June of 1996 (Defendant exhibit 3); and the other test was performed by Identigene in January, 1998 (Plaintiff's exhibit L). The Lab Corp test results dated July 19, 1996 indicated a probability of paternity to be 99.86%. The Identigene test was an additional one requested by defendant and its results dated February 9, 1998 indicated a probability of paternity to be 99.9999%. Both tests indicated that defendant could not be excluded as being the father of the child in question.
Defendant claims there are discrepancies between the two tests at probe CSFR (nomenclature for Lab Corp) and CSF1PO (nomenclature for Identigene). This is the same probe site for both tests but use different nomenclatures. Defendant claims this discrepancy is due to the genetic damage caused by the HPV and, therefore, the tests are unreliable and should be disregarded.
There was testimony given by Dr. Gutwein, plaintiff's doctor, that in 1994 plaintiff had a pap test that suggested there may be HPV present and biopsies of the cervix showed features consistent with HPV. However, all subsequent pap smears never indicated the CT Page 7 presence of HPV in plaintiff. Dr. Gutwein explained that the virus could be in remission and may still be present in plaintiff system, but she was not sure. On cross examination, Dr. Gutwein was asked whether the 1994 test could have been mis-diagnosed and she answered, "Yes, there could have been."[3] She further testified that she is not sure HPV exists today in the plaintiff and when asked if it ever existed in the plaintiff, she said:
"According to the pathologist, they found features that they interpreted as being consistent with that type of infection. That is the limit of my knowledge whether she, in fact, had the virus or not."
Defendant's expert, Dr. Carmichael, in comparing both tests indicated that if there was an alteration in the DNA it occurred in the father and not the mother.[4] So, if the mother did have HPV, her DNA did not change. Then, did she pass the HPV to the alleged father? There never was any proof that the alleged father had the HPV. There was some testimony by defendant that defendant had growths removed from his skin but it was never diagnosed as being HPV. He claims the doctor who removed them "wrote Papilloma on it." What "it" was is not disclosed, nor is there any evidence as to who the doctor was or any documentation presented to show what was written on "it."[5] The fact that the defendant had HPV was never established. Dr. Carmichael may be correct in stating that HPV could alter the DNA, however, it was never established that the defendant had HPV and that the original test of plaintiff indicating HPV, may have been mis-diagnosed, since it never appeared again in subsequent tests.
The discrepancies indicating that defendant's DNA may have changed from one test to another was answered in part by defendant's expert, Dr. Cotton, and more fully explained by the plaintiff's experts. Dr. Carmichael, who was a microbiologist, did not profess to be an expert on paternity testing. Dr. Cotton was the Laboratory Director of Cellmark, a laboratory that does DNA paternity testing. She stated that the Lab Corp test standing alone does not indicate it is false or inaccurate.[6] However, if both tests, Lab Corp and Identigene, are compared, then discrepancies appear between the two. Doctor Cotton explains that Lab Corp and Identigene use different gels.[7] When asked about the resolution factor of gel used by Lab Corp, she stated, "You cannot separate DNA fragments as well on a native gel that doesn't require the strands. It — so essentially what I am saying is that on a native gel two strands that are actually different CT Page 8 could appear to — as one."[8] She further states that the Indentigene gel (denaturing gel) gives a higher resolution than Lab Corp.
The plaintiff's experts, Dr. Staub of Identigene and Dr. Osborne of Lab Corp explained why the two tests were consistent and that there were no actual discrepancies. Dr. Osborne succinctly explained that they had another case with Identigene in which they both tested the probe identified by Identigene as CSF1PO, which was the same one in dispute in this case, and determined that what Lab Corp calls 6 is actually, in terms of international nomenclature, a 10. It has also become clear that what Lab Corp calls a 7 is actually two different possible allies, either an 11 or a 12 or both. He goes on to state because the way Lab Corp use their gels they co-migrate, you can't distinguish between the two alleles.[9] So, if you put an 11 or a 12, or both, where there is a 7 in Lab Corp, the two labs are consistent in their outcome. If you substitute a 10, where Lab Corp is a 6, and substitute an 11 or 12, or both, where there is a 7, the two labs are consistent at the probe CSFIPO, which is the probe defendant used to show "discrepancies" between Lab Corp and Identigene. (See plaintiff's exhibit L and defendant's exhibit 3.) Note CSFR (Lab Corp) is the same probe as CSFIPO (Identigene).
Dr. Osborne then goes further and state that in proficiency studies with other laboratories, Lab Corp appears to be discrepant because they are not using a standard nomenclature. But when the equivalents he stated (7=11 or 12 or both) are used, there is conformity with the other laboratories which verifies the use of such equivalents. (Page 132 August 30, 1999 Transcript)
Defendant claims the DNA evidence of paternity should be excluded because of the Daubert standard. State v. Porter,241 Conn. 57 (1997) employed the standard enumerated in Daubert v.Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The admissibility of the DNA test for paternity is not being questioned, but the methodology used to explain the "apparent discrepancies" between the results of the two laboratories is in issue. Each test standing alone (i.e., Lab Corp or Identigene) would have been acceptable, but the "apparent discrepancies" question the validity of the tests. Dr. Osborne testified as to the technique the laboratories used to explain these apparent discrepancies. He stated such apparent discrepancies appeared before between the two laboratories, and that proficiency studies with other laboratories also show such discrepancies because of the CT Page 9 difference in gels used and use of different nomenclature. From these prior studies, it was found that the use of equivalents, due to the use of different gels and nomenclature, show the results to be the same and that there were not any actual discrepancies.
Defendant claims discrepancies in the DNA tests cannot be resolved by any standard acceptable under Daubert, and therefore the testimony of Doctors Staub and Osborne should not be considered by this court. In this case, both laboratories are approved to perform DNA tests in establishing paternity and have been accepted by the court. State v. Sivri, Conn. 115, 154. The fact that there were apparent discrepancies between the two laboratory's results does not nullify the individual test results, but raises the question of why such apparent discrepancies if, in fact, there are actual discrepancies.
Although, Porter, supra, sets forth four factors trial courts may use in determining the scientific validity of reliability of the proposed theory or technique: "(1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community." State v. Porter, supra,241 Conn. 57, 64.
However, the court goes on to say that these are not exclusive factors and no one factor controls. Instead, the test is a "flexible one" designed to assure that the proposed testimony concerns a scientifically valid theory or technique, i.e., "grounded in the methods and procedures of science." Id. The court further states, "We appreciate that many of these factors lack precision, but this indefiniteness is unavoidable." Id., 86.
As to the admissibility of testimony, the court goes on to say, "Thus questions about the methodological validity of preferred scientific testimony will generally go to the weight of such evidence, not to it's admissibility." Porter, 88, supra. The court recognizes that a judge frequently should find an experts' methodology helpful [and thus admissible] even when the judge thinks that the experts' technique has flaws sufficient to render the [experts] conclusion inaccurate. In re Paoti R. Yard PCBLitigation, 35 F.3d 744-745. Id., 89. The court then concludes CT Page 10 that the scientific evidence should be deemed inadmissible "only when the methodology underlying such evidence is sufficiently invalid to render the evidence incapable of resolving the fact finder determine a fact in dispute. We adopt the Daubert
approach, however, specifically because we conclude that a sufficient showing of validity is necessary for scientific evidence to be helpful. — The interplay between these two principles — a general policy in favor of admission of helpful evidence, and a specific policy of requiring a certain level of validity before scientific testimony can properly be presented to a fact finder — cannot be resolved by an absolute statement or rule, instead, a case-by-case analysis will be necessary." Porter 89, 90, supra.
Addressing a concern that under Daubert, we are requiring courts to become amateur scientists, the court concludes that, "Under Daubert, trial judges are not required to make a determination of the ultimate scientific validity of any scientific propositions. Instead, they need only to make a much more limited inquiry: whether sufficient indicia of legitimacy exist to support the conclusion that evidence derived from the principle may be properly considered by a fact finder at trial."Porter, 90, supra.
This court does not believe the issue of differences in results between the two laboratories involves a scientific principle subject to the Daubert scrutiny for admissibility. It is this court's opinion that procedures used by the laboratories which were both accredited by AABB, is admissible to resolve the apparent discrepancies, and that any analysis for such discrepancies should go to the weight of such evidence. However, for argument sake, even if the Daubert test is applied to the testimony of the experts in this case, as adopted by Porter, this court would admit such testimony. The reason for such admission would be that both laboratories had previously experienced similar discrepancies and found that the use of different gels, both acceptable, and use of different nomenclature resulted in the apparent discrepancies. This problem also arose in proficiency studies with other laboratories for the same reasons. It was found that applying equivalents, determined by the laboratories, resolved that there were no discrepancies. Defendants argue there were no scientific tests of actual samples by both laboratories in this case, and therefore the use of equivalents is based on a hypothesis and not a scientific test. This court can only answer that the experts in question had the CT Page 11 education and experience in the field of DNA parental testing, that there was sufficient indicia of legitimacy to support their analysis and conclusions to admit their evidence in accordance with Porter, supra.
CONCLUSION:
This court finds that, notwithstanding the DNA evidence, the defendant, is the father of the child of petitioner, Karendale Waskewicz, who was born on March 27, 1996. It is found that the parties did engage in sexual intercourse at the time the child was conceived by the petitioner; the petitioner always maintained defendant was the father; she had no other sexual relations with third parties just prior to conception or during her pregnancy. In essence the court finds plaintiff's testimony to be more credible than defendant. Fortier v. Laverio, 10 Conn. App. 181.
Although the DNA tests for paternity are not required to prove paternity in this case, they would have been pivotal in finding for the defendant if the tests showed that defendant should be excluded as the father of the child. Neither test excluded the defendant, but conversely indicated that there was over a 99.8% probability of paternity. These tests, therefore, corroborate the finding of the court. Even though the admission of the DNA tests were not vital in reaching a decision by this court, it was important to address the issues raised since the facts were unique on the matters of apparent discrepancies between laboratories on DNA testing and the admissibility of scientific evidence in light of the Daubert principle as adopted by thePorter case.
The court, having established paternity in this matter, hereby continues the case to establish support and medical orders on February 8, 2000 at 1:00 p. m. in the Superior Court, Judicial District of Ansonia-Milford, 106 Elizabeth St., Derby, Connecticut, 06418. Both parties are to bring in completed financial affidavits, pay stubs, if available, and copies of the 1040 tax forms for the years 1997 and 1998 (also for 1999, if available).
ALAN E. STEELE MAGISTRATE, FAMILY SUPPORT